UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br>450 Fifth Street, NW<br>Washington, DC 20549,<br><br>                      Plaintiff,<br>v.<br><br>DAVID M. WILLEY<br>                      Defendant,<br><br>and<br><br>JOY S. WILLEY,<br>                      Relief Defendant. | Civil Action No. _____ |

**COMPLAINT**

The United States Securities and Exchange Commission ("Plaintiff" or "Commission") alleges for its Complaint as follows:

**SUMMARY**

1. This is an insider trading case. In May 2002, David M. Willey – then the Chief Financial Officer of Capital One Financial Corporation ("Capital One") – exercised 147,903 employee stock options in his and his wife's brokerage accounts and sold 60,219 shares of Capital One common stock into the open market, while in possession of material, non-public information that the Board of Governors of the Federal Reserve ("Federal Reserve") was contemplating (i) a downgrade to Capital One's supervisory assessment and (ii) the initiation of a supervisory action against Capital One. The Federal Reserve ultimately did downgrade Capital One and require Capital One to enter into a Memorandum of Understanding. Willey's transactions – all of which were completed prior to Capital One's public announcement of the Federal Reserve's actions – enriched him and his wife, Joy S. Willey, who was then a Vice President of Capital One, by millions of dollars.

2. The Commission charges Willey with violating Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] arising out of his insider-trading scheme.

3. The Commission also charges Willey with violating Section 16(a) of the Exchange Act and Rules 16a-2 and 16a-3 thereunder [15 U.S.C. § 78p(a) and 17 C.F.R. §§ 240.16a-2, 240.16a-3] for filing false disclosures with the Commission, in June 2002, on a Form 4 that failed to report all of his illegal transactions.

4. Joy S. Willey is charged as a relief defendant due to her direct and indirect receipt of the proceeds from her husband's illegal transactions and because, to this day, she continues to have access to and enjoy the ill-gotten gains of such transactions.

5. The Commission brings this action to restrain and permanently enjoin Willey from violating the antifraud and reporting provisions of the federal securities laws. The Commission also seeks to permanently bar Willey from serving as an officer or director of any public company. Additionally it seeks from Willey disgorgement of his ill-gotten gains, plus pre-judgment interest and statutory civil money penalties. The Commission also seeks from Joy S. Willey disgorgement of all the ill-gotten gains that resulted from Willey's trades, the proceeds of which flowed to Joy S. Willey, both directly and indirectly, plus pre-judgment interest.

**JURISDICTION**

6. The Commission brings this action pursuant to the authority conferred upon it by Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

7. The Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

8. Venue is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain acts alleged herein constituting violations of the Exchange Act – including the Defendants' filing of (or failure to file) required reports with the Commission – occurred within the District of Columbia.

9. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of national securities exchanges, and/or of the means and instruments of transportation or communication in interstate commerce, in connection with the transactions, acts, practices, and courses of conduct alleged herein.

**DEFENDANTS**

10. Defendant **David M. Willey** of Great Falls, Virginia was the Chief Financial Officer of Capital One at all times relevant. Willey was forced to resign from Capital One on March 3, 2003.

11. Defendant **Joy S. Willey** of Great Falls, Virginia, is married to David M. Willey. She was a Vice President of Capital One at all relevant times, until she resigned in December 2002.

## RELATED PARTIES

12. **Capital One Financial Corporation** is a Delaware corporation headquartered in Falls Church, Virginia, with subsidiaries engaged in marketing a variety of financial products and services, including so-called "sub-prime" debt. Capital One's primary focus is consumer lending, particularly credit card lending. Its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange.

## FACTS

13. The Federal Reserve commenced an examination of Capital One in February 2002 in connection with Capital One's application to merge two of its subsidiaries, Capital One Federal Savings Bank and Capital One Auto Finance, into a new entity, Capital One State Savings Bank. As a result of certain findings made by the Federal Reserve – and the general climate of the industry at the time – the examination eventually turned from an application review to a supervisory review.

14. On April 9, 2002, Federal Reserve representatives met with representatives of Capital One to discuss the examiner's findings up to that point in time. The Federal Reserve representative who conducted the meeting that day identified for Capital One a number of issues – including issues relating to management areas within Willey's purview – that its examiners had uncovered, and which the Federal Reserve considered to be serious problems.

15. Willey, the most senior Capital One employee in attendance at the April 9 meeting, expressed disagreement with the findings presented at the meeting but, following a heated discussion, agreed that Capital one would review the Federal Reserve's concerns. Willey reported the comments made at the April 9 meeting to Capital One's General Counsel, who, after speaking to the Federal Reserve's examiner-in-charge, decided that the information conveyed on April 9 need not be reported publicly. He also did not, at that time, put a ban on trading in Capital One securities by Capital One senior executives.

16. On April 11, 2002, senior officials from the Federal Reserve met with senior officials from Capital One (including Capital One's Chief Executive Officer, its General Counsel and Willey) to review the Federal Reserve's preliminary findings. No mention was made to Capital One's senior management of a potential downgrade to Capital One's supervisory assessment or to the potential for a supervisory action.

17. On April 18, 2002, Willey and other Capital One representatives met with Jon D. Greenlee ("Greenlee") and other members of the Federal Reserve's examination team at Capital One's offices in McLean, Virginia, as part of their ongoing dialogue during the examination. Greenlee was the Federal Reserve's examiner-in-charge and, in that capacity, was responsible for Capital One's ultimate evaluation. At the conclusion of the meeting, Willey asked Greenlee if he could meet with him in Willey's office for a private one-on-one discussion.

18. During their April 18 one-on-one discussion, Greenlee told Willey that the Federal Reserve was revisiting Capital One's supervisory assessment and considering a

downgrade to the assessment. He advised Willey that downgrades typically are accompanied by a supervisory action from the Federal Reserve and that, depending on the level of the downgrade, the supervisory action could be either informal or formal.

19. The Federal Reserve's assessment of an institution's management is critical for determining the severity of the supervisory action. During their private April 18 one-on-one discussion, Greenlee emphasized to Willey that the management component of the supervisory assessment was one of the principal areas of concern for the Federal Reserve. More specifically, the Federal Reserve was concerned that Capital One's finance department was not capable of generating information to adequately track Capital One's finances.

20. Willey knew that a downgraded assessment based on the management component would reflect particularly poorly on him because the managerial shortcomings identified by the Federal Reserve were primarily within his area of responsibility. Moreover, he knew that the downgrade he privately discussed with Greenlee – and the accompanying supervisory action – was serious and he knew or was reckless in not knowing that a public announcement of this information would have a very material negative impact on the Company's stock price.

21. Willey, in breach of his duties as an officer of Capital One, told no one at Capital One – neither senior management nor the Board of Directors – of Greenlee's statements, and made no mention of the likely change to Capital One's supervisory assessment or the likelihood that the Federal Reserve would initiate some type of supervisory action.

22. Willey was restricted from trading through, approximately, May 1, 2002, because of the normal trading ban placed on Capital One insiders prior to the quarterly earnings announcement and because of an agreement that Willey entered into in connection with an underwriting that was pending at the time.

23. On or about May 9, 2002, Capital One's General Counsel informed Willey that, the following week, Federal Reserve officials would be meeting with Capital One executives. The General Counsel also told Willey that the Federal Reserve had specifically requested that Willey not be present at the meeting. Willey knew, accordingly, that the information privately revealed to him by Greenlee soon would be known to the Board of Directors and the public. He also knew that the Company would follow its normal practice by imposing a ban on all trading in Capital One stock by members of the Company's control group, including Willey and his family. Additionally, he knew that, if he were terminated as a result of the Federal Reserve's actions, his stock options were set to expire 90 days after termination.

24. Commencing May 9, 2002 and continuing through May 13, 2002, Willey: (i) exercised 87,684 Capital One options in his personal account through "swap transactions," (ii) exercised 60,219 Capital One options in his wife's account through a combination of "swap transactions" and "cashless exercises" and (iii) sold in the open market all 60,219 shares resulting from the exercise of his wife's options.

25. Specifically, in his personal account, Willey tendered to Capital One 50,875 of his existing Capital One shares at the then-prevailing market price ($61.25) and exercised, at the

4

lower strike price (ranging from $33.77 to $37.08), 87,684 of his stock options, thereby acquiring 87,684 new shares of Capital One common stock. His personal holdings of Capital One common stock thus increased by 36,809 shares.

26. In his wife's account, which Willey controlled via a power-of attorney, Willey tendered to Capital One 8,144 shares of his wife's existing Capital One shares at the then-prevailing market price ($61.25) and exercised, at the lower strike price (ranging from $12.52 to $37.08), 23,347 of her stock options, thereby acquiring 15,203 new shares of Capital One common stock. He then sold all 15,203 shares at the then-prevailing market price ($62.22) for proceeds of $945,998. He also exercised 36,872 of his wife's stock options and immediately sold the resulting shares at the then-prevailing market prices (ranging from $62.00 to $62.22) for net proceeds (after paying the exercise prices ranging from $29.97 to $38.34) of $1,004,575.

27. On May 13, 2002, after Willey had completed his trades but while the examination was still ongoing, Federal Reserve representatives met with senior officials of Capital One. Willey was not present. During the meeting, the Federal Reserve informed Capital One's senior management that a downgrade to its supervisory assessment was likely and that, depending on the level of the downgrade, it would be typical for the Federal Reserve to initiate either an informal or formal supervisory action. The Federal Reserve informed Capital One that, among its concerns, was the quality of Capital One's financial management and oversight, areas that were within Willey's purview.

28. The same day, having learned of the Federal Reserve's official views for the first time, Capital One's General Counsel imposed an immediate ban on all trading in Capital One securities by control group personnel and relevant employees, including Willey and his household.

29. On June 10, 2002, Willey filed a materially inaccurate disclosure statement on Form 4 with the Commission which omitted to disclose at least 46,800 of the exercises completed between May 9 and 13, 2002.

30. On July 8, 2002, the Federal Reserve had its final meeting with Capital One during which it presented the findings of its examination. The Federal Reserve advised Capital One, at the meeting, of its final determination that: (i) the bank's supervisory assessment would be downgraded and (ii) the supervisory action would take the form of a Memorandum of Understanding ("MOU"), addressing specific issues that had been identified during the examination, including the prior-identified management issues within Willey's area of responsibility.

31. On July 16, 2002, after the close of trading, Capital One publicly announced in a Form 8-K filed with the Commission that the Federal Reserve would require it to enter into an MOU. The Company informed the public that management was one of the areas that the MOU would address.

32. On July 17, 2002, in response to the news of the Federal Reserve's supervisory action against Capital One, the price of Capital One's common stock plummeted by approximately 40%.

33. When Willey tendered his existing 50,875 shares to Capital One in May 2002, he knew or was reckless in not knowing that the market price of those shares would materially decline when the market learned of the Federal Reserve actions. By tendering those shares to Capital One prior to the announcement and by immediately exercising his 87,684 stock options, Willey obtained an additional 36,809 shares of Capital One common stock. Those additional shares were worth $1,121,938 after Capital One's July 16 announcement of the Federal Reserve's action.

34. Similarly, when Willey tendered his wife's existing 8,144 shares to Capital One in May 2002, he knew or was reckless in not knowing that the market price of those shares would materially decline when the market learned of the Federal Reserve actions. By tendering those shares to Capital One prior to the announcement and by immediately exercising 23,347 of her stock options, Willey obtained an additional 15,203 shares of Capital One common stock. He sold those additional shares in May 2002, prior to the announcement, for $945,998.

35. Likewise, when Willey exercised another 36,872 of his wife's stock options in May 2002 and immediately sold the resulting shares at the then-prevailing market prices, he knew or was reckless in not knowing that the market price of Capital One's stock would materially decline when the market learned of the Federal Reserve actions. By exercising 36,872 of his wife's stock options and selling the underlying shares prior to the July 16 announcement, he received net proceeds of $1,004,575, after paying the exercise price on the options.

36. In summary, Willey's May 2002 transactions provided him and his wife with realized and unrealized profits of millions of dollars.

37. Joy Willey – who controls accounts in both her name and her husband's name via a power-of-attorney – has profited from Willey's May 2002 transactions and continues to have access to and enjoy the ill-gotten gains of such transactions.

38. Willey was forced to resign from his position at Capital One in March 2003.

## CAUSES OF ACTION

### FIRST CLAIM – INSIDER TRADING
### (Violations of Exchange Act § 10(b) and Rule 10b-5 thereunder)

39. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 37 above.

40. Willey, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Capital One securities:

6

(a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which operated as a fraud or deceit Capital One shareholders and upon other persons.

41. As part and in furtherance of this violative conduct, Willey, in breach of a fiduciary duty to Capital One's shareholders, while in possession of material non-public information about this employer Capital One, exercised 87,684 Capital One stock options in his personal account and exercised another 60,219 Capital One stock options in his wife's account (which he controlled) and subsequently sold shares of Capital One common stock between May 9 and May 13, 2002.

42. By reason of the conduct described above, Willey violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], as further defined by Rules 10b5-1 and 10b5-2 [17 C.F.R. §§ 240.10b5-1, and 240.10b5-2].

## SECOND CLAIM – FALSE FILINGS
### (Violations of Exchange Act § 16(a) and Rules 16a-2 and 16a-3 thereunder)

43. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 41 above.

44. Willey, as an officer of Capital One, was required to file statements with the Commission pursuant to Section 16(a) of the Exchange Act [15 U.S.C. 78p(a)] and Rules 16a-2 and 16a-3 thereunder [17 C.F.R. §§ 240.16a-2 and 240.16a-3], reflecting his (including his household's) beneficial ownership of Capital One equity securities. On June 10, 2002, he filed a Form 4 with the Commission which misreported his transactions and failed to account for his exercise of at least 46,800 Capital One stock options in May 2002.

45. By reason of the conduct described above, Willey violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rules 16a-2 and 16a-3 thereunder [17 C.F.R. §§ 240.16a-2 and 240.16a-3].

## THIRD CLAIM – UNJUST ENRICHMENT
### (Against Joy S. Willey as a Relief Defendant)

46. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 45 above.

47. Joy Willey profited, in May 2002, from Willey's exercise of Capital One stock options and his subsequent sale of Capital One common stock and, to this day, she continues to have access to and enjoy the ill-gotten gains of such transactions. She received directly the proceeds from Willey's exercise of her 60,219 options and from the subsequent sale of 60,219 shares of Capital One common stock held in her personal account. Further, she controls accounts held in her husband's name via a power-of-attorney, and thus received directly or

indirectly the proceeds from Willey's exercise of 87,684 stock options held in Willey's personal account. She obtained these funds under circumstances in which it is not just, equitable or conscionable for her to retain the funds.

   48. As a consequence of the foregoing, Joy S. Willey has been unjustly enriched and the funds are subject to disgorgement.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

   (i) Permanently enjoining Willey and each of his agents, servants, employees and attorneys and those persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from engaging, directly or indirectly, in violations of Sections 10(b) and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78p(a)] and Rules 10b-5, 16a-2 and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.16a-2 and 240.16a-3];

   (ii) Ordering Willey to disgorge all ill-gotten gains, plus prejudgment interest thereon;

   (iii) Ordering Willey to pay an appropriate civil monetary penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

   (iv) Permanently barring Willey from serving as an officer or director of a public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

   (v) Ordering relief defendant, Joy S. Willey, to disgorge the amount by which she was unjustly enriched, with prejudgment interest; and

      (vi)    Awarding such other and further relief as the Court deems just and proper.

Dated: July 26, 2004
       Washington, DC

                                        Respectfully submitted,

                                        _____/s/_____
                                        Thomas C. Newkirk (DC Bar # 225748)
                                        Cheryl J. Scarboro
                                        Suzanne J. Romajas (Trial Counsel)
                                        Reid A. Muoio
                                        Timothy P. Peterson

                                        Attorneys for Plaintiff
                                        SECURITIES AND EXCHANGE COMMISSION
                                        450 Fifth Street, NW
                                        Mail Stop 09-11
                                        Washington, DC 20549
                                        Tel: 202-942-7934 (Romajas)
                                        Fax: 202-942-9581(Romajas)
                                        Email:  RomajasS@sec.gov